IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Danville Division

| | | |
|---|---|---|
| James W.,[1] | ) | |
|     Plaintiff, | ) | Civil Action No. 4:21-cv-00042 |
| | ) | |
| v. | ) | REPORT & RECOMMEDATION |
| | ) | |
| KILOLO KIJAKAZI, | ) | By:   Joel C. Hoppe |
| Acting Commissioner of | ) |        United States Magistrate Judge |
| Social Security, | ) | |
|     Defendant.[2] | ) | |

Plaintiff James W. asks this Court to review the Commissioner of Social Security's final decision denying his applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401–434, 1381–1383f. The case is before me by referral under 28 U.S.C. § 636(b)(1)(B). Having considered the administrative record, the parties' filings, and the applicable law, I find that the decision is not supported by substantial evidence. Accordingly, I respectfully recommend that the presiding District Judge reverse the decision and remand the matter under the fourth sentence of 42 U.S.C. § 405(g).

I. Standard of Review

The Social Security Act authorizes this Court to review the Commissioner's final decision that a person is not entitled to disability benefits. 42 U.S.C. §§ 405(g), 1383(c)(3); *see also Hines v. Barnhart*, 453 F.3d 559, 561 (4th Cir. 2006). The Court's role, however, is limited—it may not "reweigh conflicting evidence, make credibility determinations, or substitute

---

[1] The Committee on Court Administration and Case Management of the Judicial Conference of the United States has recommended that, due to significant privacy concerns in social security cases, federal courts should refer to claimants only by their first names and last initials.

[2] Acting Commissioner Kijakazi is hereby substituted as the proper named defendant in this action. 42 U.S.C. § 405(g); *see* Fed. R. Civ. P. 25(d).

1

[its] judgment" for that of agency officials. *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012). Instead, a court reviewing the merits of the Commissioner's final decision asks only whether the Administrative Law Judge ("ALJ") applied the correct legal standards and whether substantial evidence supports the ALJ's factual findings. *Meyer v. Astrue*, 662 F.3d 700, 704 (4th Cir. 2011); *see Riley v. Apfel*, 88 F. Supp. 2d 572, 576 (W.D. Va. 2000) (citing *Melkonyan v. Sullivan*, 501 U.S. 89, 98–100 (1991)).

"Substantial evidence" means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). It is "more than a mere scintilla" of evidence, *id.*, but not necessarily "a large or considerable amount of evidence," *Pierce v. Underwood*, 487 U.S. 552, 565 (1988). Substantial evidence review considers the entire record, and not just the evidence cited by the ALJ. *See Universal Camera Corp. v. NLRB*, 340 U.S. 474, 487–89 (1951); *Gordon v. Schweiker*, 725 F.2d 231, 236 (4th Cir. 1984). Ultimately, this Court must affirm the ALJ's factual findings if "conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled." *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam). However, "[a] factual finding by the ALJ is not binding if it was reached by means of an improper standard or misapplication of the law." *Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987).

A person is "disabled" within the meaning of the Act if he or she is unable to engage in "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *accord* 20 C.F.R. §§ 404.1505(a), 416.905(a).[3] Social Security ALJs follow a

---

[3] Unless otherwise noted, citations to the Code of Federal Regulations refer to the version in effect on the date of the ALJ's written decision.

five-step process to determine whether a claimant is disabled. The ALJ asks, in sequence, whether the claimant (1) is working; (2) has a severe impairment that satisfies the Act's duration requirement; (3) has an impairment that meets or equals an impairment listed in the Act's regulations; (4) can return to his or her past relevant work based on his or her residual functional capacity; and, if not (5) whether he or she can perform other work. *See Heckler v. Campbell*, 461 U.S. 458, 460–62 (1983); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017); 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). The claimant bears the burden of proof through step four. *Lewis*, 858 F.3d at 861. At step five, the burden shifts to the agency to prove that the claimant is not disabled. *See id.*

## II. Procedural History

James applied for DIB and SSI in January 2017, Administrative Record ("R.") 312–13, 314–18. He alleged that he became disabled on February 2, 2016, R. 312, 343, because of diabetic neuropathy, diabetes, nerve pain, trouble walking, trouble bending and standing, no feeling in left foot, high blood pressure, and sight problems, R. 347. He was forty-three years old, or a "younger person" under the regulations, on his alleged onset date. R. 143; 20 C.F.R. §§ 404.1563(c), 416.963(c). Disability Determination Services ("DDS"), the state agency, denied both claims initially in March 2017, R. 119–29, 130–40, and upon reconsideration a month later, R. 143–52, 153–62. In July 2018, James appeared with counsel and testified at an administrative hearing before ALJ Marc O'Hara. R. 80–118. ALJ O'Hara issued an unfavorable decision on December 11, 2018. R. 168–82. The Appeals Council vacated that decision and remanded the case for further consideration, R. 188–92, along with instructions to "[o]btain evidence from a psychological medical expert related to the nature and severity of and functional limitations resulting from [James's] alleged borderline intellectual functioning," R. 191. In November 2020,

James appeared for another administrative hearing, this time before ALJ Mark Baker. R. 39–60. A vocational expert ("VE") also testified at this hearing. R. 54–58. During the hearing, James's attorney told the ALJ that he had reviewed all exhibits and, "[t]he record's complete." R. 42.

ALJ Baker issued an unfavorable decision on May 3, 2021. R. 15–31. He found that James had "severe" medically determinable impairments ("MDI") of "degenerative disc disease of the cervical and lumbar spine; tendinosis, rotator cuff tear, and impingement syndrome of the right shoulder, status post arthroscopy; diabetes with neuropathy; obesity; intellectual disorder; and learning disorder." R. 18. James's "severe" impairments did not meet or medically equal a relevant Listing. R. 19–23. As part of his Listings analysis, ALJ Baker found that James's severe mental MDIs caused a "moderate limitation" in his overall capacities for understanding, remembering, or applying information; a "mild limitation" in his overall capacities for concentrating, persisting, and maintaining pace; and "no limitation" with social interaction or adapting and managing himself. R. 21 (citing 20 C.F.R. pt. 404, subpt. P, app. 1 §§ 12.05, 12.11). He also concluded that, although standardized testing from when James "was 11 years of age did reveal IQ scores of below 70," James did "not have a marked or extreme limitation in any [broad] area of mental functioning" during the relevant time. R. 23; *see* R. 22 ("The claimant has undergone standardized intellectual testing in the past. Further, while he testified that he requires assistance completing most daily activities, he has consistently stated that he can care for his personal needs independently.").

ALJ Baker assessed James's residual functional capacity ("RFC") and determined that he could perform light work[4] with the following non-exertional limitations:

---

[4] "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds." 20 C.F.R. §§ 404.1567(b), 416.967(b). "The full range of light work requires the ability to stand or walk for up to six hours per workday or sit 'most of the time with some pushing and

    he can frequently push and pull with the right upper extremity. He can frequently climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He cannot climb ladders, ropes, or scaffolds. He can frequently reach above shoulder level with the right upper extremity. He can occasionally operate foot controls with the left lower extremity. He is limited to performing simple, routine tasks, and he can concentrate in the workplace for two hours before requiring a break.

R. 23. Based on this RFC finding and the VE's testimony, the ALJ concluded that James was unable to perform his past relevant work as an "unskilled" construction laborer, R. 29, but he determined that less physically demanding jobs existed in significant numbers in the national economy that James could perform, including sorter, pre-assembler, and assembler small products, R. 29–30 (citing R. 55–56). Thus, the ALJ found that James was "not disabled" from February 2, 2016, through the date of the decision. *Id.* The Appeals Council declined to review that decision, R. 1–3, and this appeal followed.

### III. Discussion

  James challenges the ALJ's decision on three grounds. *See* Pl.'s Br. 8–21, ECF No. 15. First, James challenges the ALJ's RFC determination, contending that it overstates his abilities to stand, stoop, and reach with his right arm. James contends that his back pain, right shoulder pain, and diabetic neuropathy limit him to a greater extent than accounted for in the RFC. *See id.* at 11–20. Second, James argues that the ALJ did not conduct a "more detailed assessment" of his intellectual disorder under SSR 96-8p. *See id.* at 8–11. Lastly, James argues that the ALJ failed to develop the record by ordering additional testing to determine whether he had the language or math skills to perform the occupations relied on by the ALJ at step five. *See id.* at 21. I find that the ALJ's assessment of James's mental RFC is not supported by substantial evidence. Accordingly, my discussion focuses on that issue.

A.  Summary

---

pulling of arm or leg controls.'" *Neal v. Astrue*, Civ. No. JKS-09-2316, 2010 WL 1759582, at *2 (D. Md. Apr. 29, 2010) (quoting 20 C.F.R. § 404.1567(b)).

1. *Education Records*

As a child James was enrolled in special education services throughout most of his schooling. *See* R. 429, 501, 509, 526, 536–37, 575–76 (referral when James was in Fifth Grade for assessment for special education services). He had Individualized Education Programs in Language Arts, Math, Geography, Government, Science, Social Studies, Health, and Physical Education, R. 527–35, 542–47, 560–69. When James was nine years old, psychological testing showed that his intellectual functioning was in the borderline range. R. 555–59. Two years later, testing showed that his Full-Scale IQ score was 61, placing him in the "educable" intellectually disabled range. R. 585. In Twelfth Grade, James scored in the "percentile rank of < 1" in national standardized testing for reading, spelling, and mathematics. R. 443–46.

2. *Medical Evidence*

None of the treatment records mention James's intellectual disorder or learning disorder. Healthcare records related to James's physical conditions show that he demonstrated "normal" cognition and "appropriate vocabulary level," R. 709, or "no impairment of recent or remote memory," *e.g.*, R. 722, 752, 809, 1351, on some physical exams during the relevant time. Otherwise, those records contain no information about James's intellectual or cognitive functioning.

3. *Medical Opinion Evidence*

DDS psychological examiners did not identify James's intellectual disorder or learning disorder as MDIs, and they did not opine as to any limitations caused by those conditions. *See* R. 119–29, 130–40, 143–52, 153–62.

On October 28, 2020, Scarlett Jett, Psy.D., conducted a psychological evaluation of James at the request of DDS. R. 1505–11. James's fiancé accompanied him to the appointment.

R. 1505. On examination, Dr. Jett observed that James had "fair" social skills and manner of relating, and he was cooperative and pleasant, but "he did struggle to understand questions at times." R. 1507. James's speech was clear and fluent, but his "expressive and receptive language was poorly developed"; his thought processes were coherent and goal directed; his affect was full range; and his orientation was "to person only," not to time and place—meaning he did not know the city or date. R. 1507–08 ("He stated the city was Petersburg, and the date was 11/20/10."). James's attention and concentration as well as his recent and remote memory skills were "impaired." R. 1508. Dr. Jett assessed James's intellectual functioning as borderline, although it was not formally tested, and his general fund of information was "somewhat limited." *Id.* His insight was fair, and his common-sense judgment was good. *Id.* As to activities of daily living, James said that he could dress, bathe, and groom himself, and he could drive, clean, and shop independently. *Id.* He needed help from his fiancé when cooking or doing laundry because he could not remember or carry out all required tasks, and she helped him when he needed to take a taxi. R. 1508–09. He reported having difficulty with math, so his fiancé handled the finances. R. 1509. James spent time with his fiancé, daughter, friends, and neighbors; watched television, played videogames; and spent time outside. *Id.* Dr. Jett found that James's statements and symptoms were consistent with his test results, psychiatric history, and treatment, but she noted that she did not have his educational records. *Id.* She diagnosed learning disorder by history and recommended that James receive an IQ/cognitive evaluation. R. 1510.

As to James's functional limitations, Dr. Jett determined that he had "mild limitations understanding, remembering, or applying simple directions and instructions and moderate limitations understanding, remembering, or applying complex directions and instructions." R. 1509. She noted that James recalled three of three objects immediately, but zero of three after

delay, and he could complete up to four digits forward, but no digits backward. *Id.* He had no limitations in the following areas: using reason and judgment to make work-related decisions and take appropriate precautions around hazards; interacting with supervisors, coworkers, and public; sustaining concentration and perform tasks at a consistent pace; sustaining ordinary routine and regular attendance; behaving appropriately; and maintaining appropriate behavior and hygiene. *Id.*

    4.    *James's Statements*

In February 2017, James's fiancé completed a Function Report for him. R. 365–72; *see also* R. 51. The report indicates that James engaged in the following activities: handled his personal care, took care of the dog, shopped, drove a car, went to church, took out the trash, folded laundry, dusted furniture, watched television daily, played cards "once in a while" although he "sometime[s] … mix[ed] up the suits," and visited some with friends and family or talked to them on the phone. R. 365–70. He could not do yardwork because of his back, leg, and foot pain. R. 368. He did not have problems with authority figures, and he stayed to himself. R. 371. He had a hard time concentrating on written instructions, and he had trouble following spoken instructions because he forgot them quickly. R. 370. He could walk a block before needing to rest. *Id.* James's impairments caused problems with lifting, squatting, bending, standing, reaching, walking, sitting, kneeling, climbing stairs, seeing, remembering, completing tasks, concentrating, understanding, and following instructions. *Id.* He had "a hard time concentrating on written instructions" and did not follow spoken instructions "too well because [he] forgot quickly." *Id.*

On November 13, 2020, James testified at an administrative hearing. James graduated from high school, but he took special education classes and had trouble keeping up. R. 44–45.

James's back and shoulder pain prevented him from picking up objects weighing more than twenty pounds. R. 45, 47. He took tramadol for back pain, but it did not help. R. 46. His feet were numb. R.47. He could not work because his back and foot pain made it difficult to walk, stand, and bend over. *Id.* If James were to prepare a microwavable meal, he would need someone to explain the instructions to him. R. 48. When James was working, he would have to "repeatedly" ask for help with instructions, and others would explain things that he did not understand. R. 48, 53. His fiancé scheduled his doctor's appointments and handled their finances. R. 49. James visited with neighbors and family, watched television, shopped in stores, cooked "sometimes," and drove by himself or with his fiancé. R. 50, 54. His mother and fiancé helped James read letters and manage finances. R. 51–52. When James took his driver's license test, someone read the questions to him. R. 53.

B.   *The ALJ's Decision*

Regarding James's mental impairments, the ALJ found that James had severe MDIs of intellectual disorder and learning disorder. R. 18. At step three, the ALJ found that James's severe impairments did not meet or equal Listings 12.05 and 12.11. R. 21–23. He determined that James had moderate limitation in understanding, remembering, or applying information; mild limitation in concentrating, persisting, or maintaining pace; and no limitation in interacting with others or in adapting or managing oneself. R. 21. The ALJ also noted that despite childhood testing that showed James's IQ scores were below 70, he did not have any extreme or marked limitations in mental function. R. 23.

The ALJ then discussed James's subjective statements of his symptoms and functional limitations, and he concluded that although James's impairments could "reasonably be expected to cause the alleged symptoms," his statements about the "intensity, persistence and limiting

9

effects of th[o]se symptoms are not entirely consistent" with the evidence. R. 24. The ALJ discussed the medical evidence for each of James's severe impairments, R. 24–26, discussed and analyzed the medical opinions, R. 27–29, and explained that the evidence did not support James's reported symptoms and limitations, R. 26–27. He noted that James was "at times" able to attend doctors' appointments on his own, that he "cares for his personal needs without help," and that he "can prepare simple meals, drive, show, play basketball and videogames, and play cards with friends," all of which "implie[d] that [James's] mental impairments [were] not as problematic as he allege[d]." R. 26; *see also* R. 21–22. He also noted that James's "treatment providers [did] not describe any abnormalities in his cognitive functioning during appointments," R. 26; *see also* R. 21, and he referenced one exam in June 2016 where James had "appropriate vocabulary level and 'normal' cognitive function," R. 26. The ALJ determined that James could perform light work with several postural limitations, and he assessed mental limitations that would restrict James to "performing simple, routine tasks, and he can concentrate in the workplace for two hours before requiring a break." R. 23. Based on this RFC and the VE's testimony, the ALJ determined that James could perform several unskilled, light jobs. R. 30.

C.   Analysis

James argues that the ALJ did not conduct a "more detailed assessment" of his intellectual disorder, as required by SSR 96-8p. Pl.'s Br. 8–10.[5] Without a more detailed assessment, James contends, the ALJ's explanation of his mental RFC is flawed.

---

[5] James references the "four main categories"—(1) understanding and memory, (2) sustained concentration and persistence, (3) social interaction, and (4) adaptation—discussed in Program Operations Manual System ("POMS") DI 24510.060 and Form SSA 4734. Pl's Br. 10. The POMS recognizes that Form SSA 4734 is "merely a worksheet to aid" in making the RFC assessment. *Ritchie v. Astrue*, No. 2:11cv12, 2012 WL 4458208, at *2 (W.D. Va. June 26, 2012). James seems to note, correctly, that these "four main categories" are subsumed by the requirements of SSR 96-8p, *id.*, which discusses the requirements for properly assessing a claimant's RFC.

A claimant's RFC is his "maximum remaining ability to do sustained work activities in an ordinary work setting" for eight hours a day, five days a week despite his medical impairments and symptoms.[6] SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (emphasis omitted). It is a factual finding "made by the [ALJ] based on all the relevant evidence in the case record," *Felton-Miller v. Astrue*, 459 F. App'x 226, 230–31 (4th Cir. 2011), and it should reflect specific, credibly established "restrictions caused by medical impairments and their related symptoms" that affect the claimant's "capacity to do work-related physical and mental activities," SSR 96-8p, 1996 WL 374184, at *1, *2. *See Mascio v. Colvin*, 780 F.3d 632, 637–40 (4th Cir. 2015); *Reece v. Colvin*, 7:14cv428, 2016 WL 658999, at *6–7 (W.D. Va. Jan. 25, 2016), *adopted by* 2016 WL 649889 (W.D. Va. Feb. 17, 2016).

The Commissioner "has specified the manner in which an ALJ should assess a claimant's RFC." *Thomas v. Berryhill*, 916 F.3d 307, 311 (4th Cir. 2019). First, because RFC is by definition "a function-by-function assessment based upon all of the relevant evidence of [the claimant's] ability to do work related activities," SSR 96-8p, 1996 WL 374184, at *3, the ALJ must first identify each impairment-related functional restriction that is supported by the record, *see Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016). Second, the ALJ's decision must provide a "narrative discussion describing" how specific medical facts and non-medical evidence "support[] each conclusion" in the RFC assessment, SSR 96-8p, 1996 WL 374184, at *7, and logically explaining how he or she weighed any conflicting or inconsistent evidence in arriving at those conclusions, *Thomas*, 916 F.3d at 311. Thus, a proper RFC analysis has three components: (1) all relevant evidence considered under the correct legal standard, (2) an accurate and logical explanation how the evidence supports the ALJ's findings, and (3) conclusion. *See*

---

[6] "Symptoms" are the claimant's own description of his or her medical impairment. 20 C.F.R. §§ 404.928(a), 416.902(n).

11

*Thomas*, 916 F.3d at 311; *Woods v. Berryhill*, 888 F.3d 686, 694 (4th Cir. 2018); *Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 268–72 (4th Cir. 2017). "The second component, the ALJ's logical explanation, is just as important as the other two. Indeed, [binding] precedent makes clear that meaningful review is frustrated when an ALJ goes straight from listing evidence to stating a conclusion." *Thomas*, 916 F.3d at 311 (citing *Woods*, 888 F.3d at 694).

The RFC assessment is different from the ALJ's assessments at steps two and three. *Fears v. Berryhill*, No. 6:16cv55, 2018 WL 1547365, at *2 (W.D. Va. Mar. 29, 2018). "'The mental RFC assessment . . . requires a more detailed assessment by itemizing various functions' . . . that relate to the claimant's ability to work." *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *4). Those functions "include the abilities to: 'understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting.'" *Id.* (quoting SSR 96-8p, 1996 WL 374184, at *6); *see also Mascio*, 780 F.3d at 636 n.5 (quoting 20 C.F.R. § 416.945(c)). Remand is appropriate if the ALJ (1) "'fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record,'" *Fears*, 2018 WL 1547365, at *2 (quoting *Mascio*, 780 F.3d at 636), or (2) "when the assessment does not 'include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (*e.g.*, laboratory findings) and nonmedical evidence (*e.g.*, daily activities, observations),'" *id.* (quoting SSR 96-8p, 1996 WL 374184, at *7). The ALJ's assessment and explanation of James's abilities to understand and remember instructions does not meet the standard set out in the regulations.

In steps two through four, the ALJ discussed James's reported symptoms and limitations, his academic records, the treatment records, and the medical opinions. Discussing James's severe

impairments of intellectual disorder and learning disorder at step three, the ALJ found that James had moderate limitation in understanding, remembering, or applying information. R. 21. The ALJ noted that James consistently complained of memory problems and difficulty understanding, testing when he was a child showed diminished intellectual functioning, and he had difficulty completing memory tasks during a consultative examination in 2020. *Id.* The ALJ contrasted that information with the absence of abnormal exam findings in memory or cognitive function and James's reported abilities to prepare simple meals, drive, shop, and play cards and videogames, which the ALJ said showed James's ability to "learn, recall, and use information." *Id.* The ALJ provided a similar analysis in explaining his RFC assessment that James could perform "simple, routine tasks." R. 23–24.

As part of the RFC analysis, the ALJ assessed the credibility of James's reported symptoms and limitations, and he found them not entirely credible. In making this assessment, the ALJ must give specific reasons, supported by "references to the evidence," for the weight assigned to the claimant's statements. *Edwards v. Colvin*, No. 4:13cv1, 2013 WL 5720337, at *6 (W.D. Va. Oct. 21, 2013) (citing SSR 96-7p, 1996 WL 374186, at *2, *4–5 (July 2, 1996)). A reviewing court will uphold the ALJ's credibility determination if his or her articulated rationale is legally adequate and supported by substantial evidence in the record. *See Bishop v. Comm'r of Soc. Sec.*, 583 F. App'x 65, 68 (4th Cir. 2014) (citing *Eldeco, Inc. v. NLRB*, 132 F.32 1007, 1011 (4th Cir. 1997)); *Hines*, 453 F.3d at 565–66.

The ALJ acknowledged James's statements that he had trouble following instructions, he required help from others to do his past work, and he required help performing some simple daily tasks, such as cooking meals in a microwave, making medical appointments, managing finances, and shopping. R. 24. The ALJ questioned the severity of James's reported statements

13

and limitations, citing the absence of abnormal cognitive functioning in treatment notes and James's activities of daily living. R. 24, 26. The ALJ's reasons do not hold up.

First, the ALJ cited one treatment note to support his conclusion that no treatment providers described abnormalities in his mental status or cognitive function. *See* R. 26 (citing Ex. 2F at 3 (R. 709)).[7] The ALJ found that the treatment note documented James had "appropriate vocabulary level and 'normal' cognitive function." *Id.* The ALJ did not acknowledge, however, that the nurse practitioner who authored the note was treating James for complaints of back pain and that the treatment note does not mention James's intellectual disorder or learning disorder. *See* R. 707–10. Moreover, the brief observations in that treatment note conflict with the focused and detailed observations from Dr. Jett's psychological evaluation as well as James's education records. Dr. Jett found that James had poorly developed language, he struggled to understand questions, he was oriented only to person and not place or time, and his concentration and attention and memory skills were impaired. James's education records showed a Full-Scale IQ of 61, which was in the "educable" intellectually disabled range. He took special education classes, and he scored below 1% on math and reading standardize tests in the Twelfth Grade. Taken together, that evidence shows James had very significant intellectual limitations. In questioning James's symptoms, the ALJ did not reconcile the contradictory information from the single treatment note with Dr. Jett's observations and testing and James's education records, nor did the ALJ explain why he found that treatment note more persuasive than this other evidence that appears more relevant and probative of James's intellectual functioning. *See Mascio*, 780 F.3d at

---

[7] The Commissioner cites dozens of treatment notes documenting that James was neurologically "intact" and "displayed no memory issues." Def.'s Br. 11, ECF No. 21 (citing records that note, "Neurologic evaluation reveals – alert and oriented x 3 with no impairment in recent or remote memory," or "Neurological: Memory Loss: Negative."). The ALJ did not cite those records as evidence of James's intellectual functioning. Moreover, those treatment notes show that James was being treated for various physical ailments, primarily hypertension; diabetic neuropathy; and back, neck, and shoulder pain, but the notes do not mention his intellectual disorder or learning disorder.

14

637 ("Because we are left to guess about how the ALJ arrived at his conclusions on Mascio's ability to perform relevant functions and indeed, remain uncertain as to what the ALJ intended, remand is necessary.").

Second, the ALJ's analysis of James's activities of daily living is flawed. Discussing James's intellectual impairments for the listings and RFC, the ALJ noted that James can prepare simple meals, drive, shop, and play cards and video games. R. 21, 26. From these activities, the ALJ determined that James "may have problems with his memory and understanding at times, but he is capable of understanding, remembering, and applying information in some situations," R. 21, and "his mental impairments are not as problematic as he alleges," R. 26. The ALJ correctly identified many of James's activities, but he did not acknowledge the limitations James placed on his abilities to perform those activities, *see Woods*, 888 F.3d at 694 ("An ALJ may not consider the *type* of activities a claimant can perform without also considering the *extent* to which she can perform them."), nor did he explain how those activities showed that James could perform simple, routine tasks for eight hours a day, five days a week, *see Brown v. Comm'r of Soc. Sec. Admin.*, 873 F.3d 251, 263 (4th Cir. 2017) ("[T]he ALJ provided no explanation as to how those particular activities . . . showed that he could persist through and eight-hour workday.").

In his Function Report and testimony, James said he could drive and shop, but he did not handle his finances. He cooked "sometimes," but he required assistance to understand directions to prepare a meal using a microwave. R. 48, 54. James played card games "every once in [a] while," but he did not say what type of game or how complex it was, and he "sometime[s] … mix[ed] up the suits." R. 369. Dr. Jett noted that James said he played "videogames," but she did not elaborate. R. 1509. Considering these activities together, they show that James struggled to

15

understand even simple actions, such as using a microwave or remembering the suits—there are only four—in a deck of cards. The ALJ's credibility assessment does not accurately portray the limited nature of James's abilities to understand and remember depicted by his daily activities. Even if it did, "[c]ourts have warned against equating modest daily activities like doing household chores with a person's 'ability to hold a job outside the home.'" *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Moreover, the ALJ acknowledged that James has limitations in understanding and remembering, but the ALJ did not explain how merely restricting James to "simple, routine tasks" fully accommodated his limitations. *See Woods*, 888 F.3d at 694 (the ALJ must build an "accurate and logical bridge" from the evidence of record to his conclusion).

The ALJ also did not discuss James's testimony about his difficulties performing his past work as a construction worker. James testified that he had to "repeatedly" ask for help with instructions and others had to explain work tasks that he did not understand. R. 48, 53. The VE identified James's past relevant work as a construction worker as very heavy and unskilled. R. 55. "'Unskilled' is a term of art, defined by regulation as 'work which needs little or no judgment to do simple duties that can be learned on the job in a short period of time.'" *Fisher v. Barnhart*, 181 Fed. App'x 359, 364 n.3 (4th Cir. 2006) (quoting 20 C.F.R. § 404.1568(a)). Unskilled work requires the ability "to understand, carry out, and remember *simple instructions*; to respond appropriately to supervision, coworkers, and usual work situations; and to deal with changes in a routine work setting." Soc. Sec. Ruling 85-15, 1985 WL 56857, at *4 (emphasis added); *see also* 20 C.F.R. §§ 404.1568(a), 416.968(a) ("Unskilled work is work [that] needs little or no judgment to do simple duties that can be learned on the job in a short period of time."). Based on the VE's testimony, the ALJ found that James could perform other unskilled jobs. Nevertheless, the ALJ did not discuss James's testimony that he required repeated help and

16

instructions to understand his job tasks for unskilled work, and the ALJ did not marshal evidence to counter that testimony. *See Hines*, 453 F.3d at 565 ("The deference accorded an ALJ's findings of fact does not mean that we credit even those findings contradicted by undisputed evidence."). The ALJ did not explain how James could perform other unskilled work without help, and, beyond limiting James to "simple, routine tasks," the ALJ did not accommodate James's asserted need for help in understanding and remembering simple instructions. Moreover, the record is replete with evidence of James's difficulty understanding and remembering instructions.

  Lastly, the ALJ's discussion of Dr. Jett's opinion requires some further explanation. Dr. Jett observed that James struggled to understand her questions, was oriented only to person and not to place or time, and his attention and concentration and recent and remote memory skills were impaired. She determined that James had mild limitation in understanding, remembering, and applying simple directions and instructions. The ALJ found her opinion "consistent with the evidence," R. 28, but "somewhat vague and does not explain precisely what [James] can do despite his impairments," R. 29. The ALJ seems to have credited to a degree Dr. Jett's opinion that James had "mild" limitation in understanding or remembering even simple instructions, but the ALJ did not explain whether or how the restriction in James's RFC to performing "simple, routine tasks" fully accommodated this mild limitation.

  Accordingly, I find that the ALJ's explanation precludes meaningful review of his RFC assessment of James's abilities to understand and remember work instructions. Thus, I cannot find that the decision is support by substantial evidence. *See Patterson v. Comm'r of Soc. Sec. Admin.*, 846 F.3d 656, 662 (4th Cir. 2017) ("[B]ecause we cannot gauge the propriety of the

ALJ's RFC assessment, we cannot say that substantial evidence supports the ALJ's denial of benefits.").

## IV. Conclusion

For the foregoing reasons, I respectfully recommend that the presiding District Judge **GRANT** James's Motion for Summary Judgment, ECF No. 14, **DENY** the Commissioner's Motion for Summary Judgment, ECF No. 20, **REVERSE** the Commissioner's final decision, **REMAND** the matter under the fourth sentence of 42 U.S.C. § 405(g), and **DISMISS** this case from the Court's active docket.

### Notice to Parties

Notice is hereby given to the parties of the provisions of 28 U.S.C. § 636(b)(1)(C):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14 day period, the Clerk is directed to transmit the record in this matter to the presiding District Judge.

The Clerk shall send certified copies of this Report and Recommendation to all counsel of record.

ENTER: March 3, 2023

Joel C. Hoppe
United States Magistrate Judge